

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| NORTH DALLAS PLASTIC SURGERY ASSOCIATES and HARLAN POLLOCK, M.D. | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CIVIL ACTION NO. **3 07 CV 2 0 6 7 - G** |
| DIRECTORY ASSISTANTS, INC., | § § | *17425* |
| Defendant. | § | |

## NOTICE OF REMOVAL

**To the Honorable Court:**

Pursuant to 28 U.S.C. §§ 1332, 1441 and 1446, Defendant Directory Assistants, Inc., the sole defendant in a civil action pending in Texas state court, removes this action from the 192nd Judicial District Court of Dallas County, Texas, Cause No. 07-14012 to this Court on the following grounds:

### I. GROUNDS FOR REMOVAL

1.      Plaintiff North Dallas Plastic Surgery Associates is a professional association formed under the laws of Texas with its principal place of business in Dallas County, Texas. Plaintiff is thus a citizen of Texas.

2.      Plaintiff Harlan Pollock, M.D. is an individual who resides in and is a citizen of the state of Texas.

3.      Defendant Directory Assistants, Inc. is a corporation formed under the laws of Connecticut with its principal place of business in Connecticut.  Defendant is thus a citizen of Connecticut.

4.      Defendant Directory Assistants, Inc., the sole defendant in this civil action, invokes the diversity jurisdiction of the United States District Court for the Northern District of Texas, Dallas Division, which is the proper district and division pursuant to 28 U.S.C §§ 124 & 1441.

5.      Removal is proper because complete diversity exists between Plaintiffs and Defendant.  Plaintiff North Dallas Plastic Surgery Associates was a citizen of Texas when this action was commenced and, on information and belief, is a citizen of Texas when Defendant removes this action.  Plaintiff Harlan Pollock, M.D. was a citizen of Texas when this action was commenced and, on information and belief, is a citizen of Texas when Defendant removes this action.  Defendant was a citizen of Connecticut when this action was commenced and is a citizen of Connecticut when it removes this action.  Defendant was not a citizen of Texas when this action was commenced nor is it a citizen of Texas when it removes this action.

6.      Removal is also proper because the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.  Plaintiffs seek declaratory judgment that they are not liable for a claim in excess of $75,000.  *See* Ex. B-2 at 10 ¶ 26, Ex. C to Ex. B-2 at 8.  Plaintiffs also seek an injunction against arbitration proceedings about that claim.  *See* Ex. B-2 at 11 *et seq.*  Accordingly, this Court has diversity jurisdiction under 28 U.S.C. § 1332.  *See Leininger v. Leininger*, 705 F.2d 727, 729 (5th Cir. 1983) ("To put it another way, the amount in controversy, in an action for declaratory or injunctive relief, is the value of the right to be protected or the extent of the injury to be prevented."); *Webb v. Investacorp, Inc.*, 89 F.3d 252, 256 (5th Cir. 1996) (analyzing and allowing removal of state court suit to enjoin arbitration proceeding).

7.      Plaintiffs filed this action on November 29, 2007, and sent a copy to Defendant

that day.  Plaintiffs purported to serve the Texas Secretary of State on December 5, 2007.  Thus, this notice of removal is filed within thirty days of both Defendant's receipt of the summons and Plaintiffs' Original Petition and is timely filed under 28 U.S.C. § 1446(b).

8.      True and correct copies of all process, pleadings, and orders purportedly served upon Defendant in the removed action are filed with this Notice as required by 28 U.S.C. § 1446(a).  *See* Part II.13.(c), *infra* "Exhibit B."

9.      Defendant has promptly given Plaintiffs written notice of the filing of this Notice of Removal as required by 28 U.S.C. § 1446(d).

10.     Defendant is filing a copy of this Notice of Removal with the clerk of the state court where the state action is pending effecting removal pursuant to 28 U.S.C. § 1446(d).

11.     Defendant removes this case, styled *North Dallas Plastic Surgery Associates and Harlan Pollock M.D. v. Directory Assistants, Inc.*, Cause No. 07-14012, in the District Court of Dallas County, Texas, 192nd Judicial District.

12.     This Notice of Removal is filed subject to and without waiver of any defenses or objections to Plaintiffs' Original Petition and Application for Injunctive Relief to the fullest extent allowed under the Federal Rules of Civil Procedure or applicable law.

## II. COMPLIANCE WITH LOCAL RULES

13.     Pursuant to N.D. Local R. 81.1, the following documents are attached as exhibits to this Notice and all copies:

      a.      An index of all documents clearly identifying each document and when it was filed in state court;

      b.      A copy of the state court docket sheet (Exhibit A);

      c.      A copy of all documents filed in the state court action, arranged

chronologically by date of filing, including documents purportedly served on Defendants (Exhibit B);

d.    A separately signed Certificate of Interested Persons complying with N.D. Local R. 3.1(f) (Exhibit C);

e.    A Corporate Disclosure Statement pursuant to FED. R. CIV. P. 7.1 (Exhibit D);

14.    The filing fee has been paid to the Clerk.

### III. CONCLUSION

15.    Defendant Directory Assistants, Inc. respectfully requests that the Court and all parties hereto take notice that this action, formerly pending in the 192nd Judicial District Court of Dallas County, Texas, has been removed to and is now pending on the docket of the Northern District of Texas, Dallas Division.

Respectfully submitted,

DAVID S. COALE
  State Bar No. 00787255
CARRINGTON, COLEMAN, SLOMAN, &
  BLUMENTHAL, L.L.P.
901 Main Street, Suite 5500
Dallas, Texas 75202-3767
Telephone:  214/855-3000
Telecopy:    214/855-1333
dcoale@ccsb.com

***Attorneys for Defendant Directory
Assistants, Inc.***

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon attorneys of record of all parties to the above cause via U.S. Mail in accordance with Rule 5, Federal Rules of Civil Procedure, on this 11th day of December, 2007.

David Coale

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

NORTH DALLAS PLASTIC SURGERY         §
ASSOCIATES and HARLAN POLLOCK,       §
M.D.                                 §
                                     §
    *Plaintiffs*,                    §
                                     §
v.                                   §      CIVIL ACTION NO. _____
                                     §
DIRECTORY ASSISTANTS, INC.,          §
                                     §
    *Defendant*.                    §

## NOTICE OF REMOVAL – INDEX OF EXHIBITS

| | |
|---|---|
| Exhibit A | Docket for *North Dallas Plastic Surgery Associates, et al., v. Directory Assistants, Inc.*, Case No. DC-07-14012; 192nd Judicial District Court of Dallas County, Texas |
| Exhibit B | State Court Documents |
| Exhibit B-1 | Citation for Original Petition and Application for Injunctive Relief, issued November 29, 2007 |
| Exhibit B-2 | Plaintiffs' Original Petition and Application for Injunctive Relief, filed November 29, 2007 |
| Exhibit B-3 | Temporary Restraining Order (form 322) issued November 29, 2007 |
| Exhibit B-4 | Order granting Temporary Restraining Order, dated November 29, 2007 |
| Exhibit B-5 | Notice to Show Cause, issued on November 30, 2007 |
| Exhibit B-6 | Letter from Secretary of State forwarding process, dated December 5, 2007 |
| Exhibit B-7 | Plaintiffs' Brief in Support of Their Application for Injunctive Relief, dated December 10, 2007 |
| Exhibit C | Certificate of Interested Parties |
| Exhibit D | Corporate Disclosure Statement |



# REGISTER OF ACTIONS
## CASE NO. DC-07-14012

| | | | |
|---|---|---|---|
| **NORTH DALLAS PLASTIC SURGERY ASSOCIATES vs. DIRECTORY ASSISTANTS INC** | §<br>§<br>§<br>§<br>§ | Case Type:<br>Subtype:<br>Date Filed:<br>Location: | **OTHER (CIVIL)**<br>**INJUNCTION**<br>**11/29/2007**<br>**192nd District Court** |

---

### PARTY INFORMATION

| | | **Lead Attorneys** |
|---|---|---|
| **DEFENDANT** | **DIRECTORY ASSISTANTS INC** | |
| **PLAINTIFF** | **NORTH DALLAS PLASTIC SURGERY ASSOCIATES** | PIERCE, LAUREN<br>*Retained* |

---

### EVENTS & ORDERS OF THE COURT

| | |
|---|---|
| | **OTHER EVENTS AND HEARINGS** |
| 11/29/2007 | BOND FILED |
| 11/29/2007 | CITATION SOS/COI/COH/HAG |
| | DIRECTORY ASSISTANTS INC       unserved |
| 11/29/2007 | ISSUE CITATION |
| 11/29/2007 | ISSUE TRO AND NOTICE |
| 11/29/2007 | ORDER - TEMPORARY RESTRAINING ORDER |
| . | Vol./Book 417K, Page 58,  3 pages |
| 11/29/2007 | ORIGINAL PETITION (OCA) |
| 11/29/2007 | TEMPORARY RESTRAINING ORDER |
| | DIRECTORY ASSISTANTS INC       unserved |
| 11/30/2007 | NOTICE |
| | DIRECTORY ASSISTANTS INC       unserved |
| 12/12/2007 | **Temporary Injunction**  (2:00 PM) (Judicial Officers MCFARLIN, SHERYL, SMITH, CRAIG)<br>    *D will appear by phone; David Ford 860-633-0122* |

---

### FINANCIAL INFORMATION

| | | | |
|---|---|---|---|
| | **PLAINTIFF** NORTH DALLAS PLASTIC SURGERY ASSOCIATES | | |
| | Total Financial Assessment | | 245.00 |
| | Total Payments and Credits | | 249.00 |
| | **Balance Due as of 12/11/2007** | | **(4.00)** |
| 11/29/2007 | Transaction Assessment | | 217.00 |
| 11/29/2007 | Transaction Assessment | | 24.00 |
| 11/29/2007 | PAYMENT (CASE FEES)    Receipt # 67831-2007-DCLK | COOPER, SCULLY PC | (249.00) |
| 11/29/2007 | Transaction Assessment | | 4.00 |

FORM NO. 353-4—CITATION

# THE STATE OF TEXAS

To:  **DIRECTORY ASSISTANTS INC**
BY SERVING THE SECRETARY OF STATE
OFFICE OF THE SECRETARY OF STATE
CITATIONS UNIT - P.O. BOX 12079, AUSTIN, TX, 78711

GREETINGS:

You have been sued. You may employ an attorney. If you or your attorney do not file a written answer with the clerk who issued this citation by 10 o'clock a.m. of the Monday next following the expiration of twenty days after you were served this citation and **ORIGINAL PETITION AND APPLICATION FOR INJUNCTIVE RELIEF**, a default judgment may be taken against you.

Your answer should be addressed to the clerk of the **192nd District Court** at 600 Commerce Street, Dallas, Texas 75202.

Said **PLAINTIFF** being **NORTH DALLAS PLASTIC SURGERY ASSOCIATES**

Filed in said Court ON THIS THE 29TH DAY OF NOVEMBER, 2007 against
**DIRECTORY ASSISTANTS INC**

For suit, said suit being numbered **DC-07-14012** the nature of which demand is as follows:
Suit On **OTHER (CIVIL)**, etc.

as shown on said petition _____, a copy of which accompanies this citation. If this citation is not served, it shall be returned unexecuted.

WITNESS: GARY FITZSIMMONS, Clerk of the District Courts of Dallas, County Texas.
Given under my name and the Seal of said Court at office on this the **29th day of November, 2007**
ATTEST: GARY FITZSIMMONS
Clerk of the District Courts of Dallas, County, Texas

By _____
**CAROLL JONES**

---

ATTY (SOS)

# CITATION

No.: DC-07-14012

**NORTH DALLAS PLASTIC SURGERY ASSOCIATES**
VS.
**DIRECTORY ASSISTANTS INC**

ISSUED
ON THIS THE 29TH DAY OF
NOVEMBER, 2007

GARY FITZSIMMONS
Clerk District Courts,
Dallas County, Texas

By **CAROLL JONES**, Deputy

Attorney for : Plaintiff
**LAUREN PIERCE**
**COOPER & SCULLY P C**
**900 JACKSON STREET, SUITE 100**
**DALLAS  TEXAS  75225**
**214-712-9500 TELEPHONE**
**214-712-9540 FAX**

SECRETARY OF STATE
AUSTIN, TEXAS
07 DEC -5 PM 1:39

RECEIVED

DEPUTY DISTRICT COURT OF DALLAS COUNTY TEXAS

**OFFICER'S RETURN
FOR INDIVIDUALS**

Received this Citation the _____ day of _____, 20____, at _____ o'clock. Executed at _____, within the County of _____, State of _____, on the _____ day of _____, 20____, at _____ o'clock, by delivering to the within named _____ each in person, a copy of this Citation together with the accompanying copy of Plaintiff's original petition, having first indorsed on same the date of delivery.

------000000------

**OFFICER'S RETURN
FOR CORPORATIONS**

Received this Citation the _____ day of _____, 20____, at _____ o'clock. Executed at _____, within the County of _____, State of _____, on the _____ day of _____, 20____, at _____ o'clock ____.M. by summoning the within named Corporation, _____ by delivering to _____ said _____ President - Vice President - Registered Agent - in person, of the a true copy of this citation together with the accompanying copy of Plaintiff's original petition, having first indorsed on same the date of delivery.

------000000------

The distance actually traveled by me in serving such process was _____ miles and my fees are as follows:   To certify which witness by my hand.

For Serving Citation   $ _____       Sheriff _____

For Mileage           $ _____       County of _____

For Notary            $ _____       State of _____

Total Fees            $ _____       By _____

(Must be verified if served outside the State of Texas)

State of _____

County of _____

Signed and sworn to me by the said _____ before me this _____ day of _____, 20____, to certify which witness my hand and seal of office.

_____
State & County of

Seal



CAUSE NO. *07-14012*

| | | |
|---|---|---|
| NORTH DALLAS PLASTIC SURGERY | § | IN THE DISTRICT COURT |
| ASSOCIATES and HARLAN POLLOCK, M.D. | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | 192nd JUDICIAL DISTRICT |
| | § | |
| DIRECTORY ASSISTANTS, INC. | § | |
| | § | |
| Defendant. | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION
## AND APPLICATION FOR INJUNCTIVE RELIEF

Plaintiffs North Dallas Plastic Surgery and Associates and Dr. Harlan Pollock file this Original Petition and Application for Injunctive Relief as follows:

### I.    PLAINTIFF'S ORIGINAL PETITION

### DISCOVERY CONTROL RULE

Plaintiffs intend to conduct discovery under Level 2 of Texas Rule of Civil Procedure 190.3 and affirmatively plead that they seek injunctive relief.

### PARTIES

Plaintiff North Dallas Plastic Surgery and Associates ("NDPS") is a professional association formed under the laws of the State of Texas with its principle place of business located in Dallas County, Texas.

Plaintiff Dr. Harlan Pollock is a physician specializing in plastic and reconstructive surgery, is the president of NDPS, and resides in Dallas County, Texas.

Defendant Directory Assistants, Inc. ("DAI") is a corporation formed under the laws of the State of Connecticut, with its principle place of business at 500 Winding Brook Drive,

Glastonbury, Connecticut 06033. DAI may be served by serving the Texas Secretary of State as its agent of service because DAI is a foreign corporation doing business in Texas that failed to appoint or maintain a registered agent in Texas, and thus service on the Texas Secretary of State is authorized by Tex. Civ. Prac. & Rem. Code § 17.044 and/or Tex. Bus. Corp. Act § 8.10.

## JURISDICTION AND VENUE

This court has jurisdiction over DAI because it contracted with a Texas resident and one party was to perform the contract in whole or part in Texas, and because it committed a tort in whole or in part in Texas. Venue is proper in Dallas County pursuant to Tex. Civ. Prac. & Rem. Code § 15.002 and 15.092.

## FACTUAL BACKGROUND

1.  NDPS is an association of physicians in Dallas County, Texas who specialize in plastic and reconstructive surgery. Dr. Harlan Pollock is a physician associated with NDPS.

2.  In 2004, Dr. Pollock attended a professional conference. At this conference Defendant Directory Assistants, Inc., ("DAI") had a booth set up promoting its services. Dr. Pollock stopped at this booth and DAI's employee or representative represented or implied that DAI's consultants had special knowledge and contacts with the telephone companies and could use this specialized knowledge to negotiate better yellow page rates.

3.  At this time NDPS was in the process of renewing advertising for the Dallas SBC (now AT&T) 2005 directory. NDPS's advertising in the 2004 directory consisted of display advertisements and other non-display listings.

4.  In July 2004, a DAI consultant met with Dr. Pollock, in his capacity as a representative of NDPS, for a brief meeting in NDPS's Dallas office during which

DAI made its sales presentation. During this meeting Dr. Pollock expressed his dissatisfaction with the way the phone companies operated with respect to yellow pages advertising, and told the representative that he felt it was difficult to deal with the phone company representatives. Dr. Pollock further stated that he was unhappy enough with yellow pages advertising that he was ready to stop advertising in the yellow pages completely. This brief meeting was the *only* meeting that ever occurred between DAI and NDPS.

5.   DAI promised Dr. Pollock that it could provide information or advice that would result in reduced yellow page advertising costs. DAI represented that it would study the factors specific to the business of NDPS as they relate to NDPS's advertising needs and would educate NDPS on various yellow page options and strategies by disclosing information, cost saving suggestions, theories, options and advice NDPS should consider when purchasing yellow pages advertising. DAI promised that these cost reductions would result in advertising that was *as or more effective* than what NDPS had been using. DAI represented or intimated that it would be able to use its contacts and specialized knowledge of yellow page advertising to negotiate better rates for NDPS.

6.   After meeting with DAI's representative, Dr. Pollock, on behalf of NDPS, agreed to enter into a three-year Consulting Contract ("Consulting Contract") with DAI based on DAI's representations that it would fully analyze and study NDPS's business and advertising needs and, based on that analysis, would propose advertising alternatives that were more cost-effective than what NDPS had been previously doing. Additionally, Dr. Pollock entered into the Consulting Contract



based on DAI's representation that it had special knowledge of the inner workings of the yellow pages companies and had contacts within the companies. A true and correct copy of the Consulting Contract is attached to this petition as <u>Exhibit A</u>.

7. However, the brief sales proposal meeting with DAI's representative during DAI's sales proposal was the *only* meeting that ever occurred between DAI and NDPS. Contrary to its promises, DAI never asked or discussed with Dr. Pollock or NDPS the nature of the plastic surgery market in Dallas, how NDPS obtained its patients, what type of procedures it performed, what its competition was like, what percentage of patients came from yellow pages advertising versus referrals, NDPS's practice volume or revenue, or other factors specific to the business of NDPS as they might relate to its advertising needs.

8. DAI simply advised NDPS (without any further analysis or study of NDPS's practice and advertising needs) to discontinue all advertising except one small ad that DAI would design. Aside from this purported cost-saving "advice" DAI disclosed no information, theories, options, or advice that NDPS should consider when making its yellow pages advertising decisions. DAI provided no specific information on the various Dallas area directories, sizes, strategies, copy, concepts, colors, market plans, or experience as it promised to do in the Consulting Contract.

9. Dr. Pollock, acting for NDPS, followed DAI's recommendation in good faith based on his understanding that DAI had special knowledge with respect to yellow pages advertising and authorized DAI to advertise on its behalf with the

Dallas SBC yellow pages   NDPS additionally approved placement of the advertisement "designed" by DAI in the Dallas SBC directory.

10.    On or about September 27, 2004, after the advertisement order was placed for the January 2005 Dallas SBC yellow pages, DAI sent NDPS a bill for $16,668, which was DAI's calculation of half of NDPS's savings from the "baseline" year of advertising – a savings it calculated to be $33,336.   Dr. Pollock did not understand how DAI defined the "baseline" year or how DAI defined "savings," and it did not make sense to Dr. Pollock that he would owe DAI over $16,000 when all DAI told him to do was drop most of his previous advertising (he could have figured out that himself!).   In fact, Dr. Pollock noted in an email to DAI: "I am unhappy with your definition of savings . . ."   Nevertheless, NDPS paid the bill relying on DAI's promises that its advertising strategy would lead to the same or more business for NDPS at a lower cost.

11.    In October 2004 DAI began to ask Dr. Pollock about advertising in the McKinney (a suburb of Dallas) SBC directory.   Because Dr. Pollock understood from DAI's initial sales proposal that DAI had an "inside track" with the phone companies and could negotiate better rates than individual business could on their own, Dr. Pollock asked DAI if it was able to reduce the cost of the current advertising in the McKinney book by negotiating on behalf of NDPS.   DAI informed NDPS that it "can't reduce the cost of your current program as it is."   This was the first time Dr. Pollock learned that DAI could do no better in negotiating rates than NDPS could do on its own.

12.   DAI's recommendation for the McKinney SBC directory was to use the same advertisement NDPS placed in the 2005 Dallas SBC directory.  NDPS did not act on this recommendation, and never authorized DAI to act on its behalf with respect to the McKinney SBC directory.  Instead, NDPS placed the same display ad that it had in the previous year's directory, and additionally placed a smaller-sized leader ad with the same design as the display ad instead of a 3-inch anchor ad that had been in the previous year's directory.  These were advertisements that NDPS had been using long before it encountered DAI, and had no similarity at all to the ad DAI had "designed" for NDPS for the Dallas directory.  NDPS has never authorized DAI to act as its agent in placing advertisements in the McKinney directory, and has never used any information or advice given to NDPS by DAI in placing advertisements in that directory.  Nevertheless, DAI has billed NDPS for services in connection with that directory.

13.   In or about February 2005, DAI contacted NDPS stating, "Our records show that you have advertising in some Verizon directories.  Does the doctor want us to handle these for him?"  Dr. Pollock replied that he *did not* want DAI to handle any Verizon directories.  NDPS never has authorized DAI to act as its agent in placing advertisements in any Verizon directory, and has never used any information or advice given to NDPS by DAI in placing advertisements in those directories.  Nevertheless, DAI has billed NDPS for services in connection with the Plano Verizon directory.

14.   With respect to the advertisement placed in the Dallas SBC 2005 directory, by October 2005, Dr. Pollock had seen a significant drop in yellow pages referrals



and began to see that the Consulting Contract was a complete farce. NDPS had paid DAI over $16,000 for DAI's professional "advice" that NDPS could save money in advertising if it discontinued most of its advertising – something that anyone could have figured out without the assistance of DAI or anyone else. Moreover, the ad that DAI "designed" and recommended as the sole advertisement in the Dallas SBC directory was wholly ineffective.

15.   In October 2005, Dr. Pollock sent a letter to DAI expressing NDPS's dissatisfaction with the Dallas SBC advertising, notifying DAI that its yellow page referrals had diminished to the point of affecting its over-all revenue, and notifying DAI that NDPS intended to return to the type of advertising it had been doing prior to engaging DAI (in other words, using an upgraded version of the display advertisement it had used previously in order to meeting the changing business environment). NDPS further notified DAI in this letter that it was terminating DAI's consulting services.

16.   Aside from the initial brief meeting in July 2004, and the ad that DAI "designed" for the 2005 Dallas SBC directory, NDPS has not consulted with DAI at all for any other directory, including subsequent issues of the Dallas SBC directory. NDPS has not placed any advertisement remotely resembling the ad "designed" by DAI in any other directory.

17.   Despite the fact that DAI has not provided any type of consulting services beyond that for which it was handsomely overpaid in 2004, DAI has billed NDPS for services it allegedly rendered in years 2 and 3 of the contract. NDPS refused to pay these bills because DAI provided no services for the fees billed, and because,



among other reasons, the entire contract is void for a failure of consideration and is unconscionable.

18. DAI's billings are based on its interpretation of the contract, which is not only ambiguous but is so one-sided in favor of DAI as to be unconscionable. Had Dr. Pollock understood how DAI interpreted "savings" and "baseline" and other terms of the contract, NDPS would never have entered into the contract in the first place.

19. Additionally, DAI represented and implied to NDPS that it had an "inside track" with the phone companies and thus would be able to negotiate better advertising rates in the directories than NDPS could negotiate on its own. NDPS relied on this representation when it entered into the Consulting Contract, and would not have signed the contract had it understood that DAI could obtain no better rates that NDPS could on its own.

20. Finally, DAI led NDPS to believe that it had specialized knowledge about the yellow pages advertising industry such that a tiny advertisement placed in the largest and most-used yellow pages directory in the Dallas area (the Dallas SBC directory) would be as or more effective than the display ads NDPS had previously been placing. Had NDPS known that the tiny and unremarkable ad recommended and "designed" by DAI would be wholly ineffective, NDPS would not have entered into the Consulting Contract.

21. There is precedent for this very contract to have been found unconscionable. *YellowPageConsultants, Inc. v. Kate's Paperie*, 2003 WL 1874737 (Conn. Super. 2003) involved a yellow pages consulting company using an identical consulting

contract asserting the same claims in a Connecticut arbitration that it asserts in the ADR Center arbitration here.  The corporation YellowPageConsultants, Inc., is now dissolved, but had the same business address as DAI and the same president, David Ford.  In the *Kate's Paperie* case, the court upheld an arbitration award against YellowPageConsultants in which the arbitrator found a contract essentially identical to the contract here to be unconscionable.  A copy of this case is attached for convenience as <u>Exhibit B</u>.

**CAUSES OF ACTION**

**A.    DECLARATORY JUDGMENT**

22.    NDPS and DAI have a dispute regarding the construction and validity of the Consulting Contract.

23.    NDPS contends that the contract is null, void or voidable, and unenforceable because its terms are unconscionable, and because DAI fraudulently induced NDPS to enter into the contract by making representations as to the services it would provide that were not true.  NDPS further contends that the contract is ambiguous and should be construed against the drafter, DAI.  NDPS additionally asserts that the contract is unenforceable because of a failure of consideration in whole or in part or because the consideration is illusory.

24.    NDPS additionally contends that the arbitration clause in the Consulting Contract is null, void or voidable, and unenforceable because its terms are unconscionable, and because it provides for an arbitration in a forum that is biased in favor of DAI.

25.    NDPS seeks a declaration that the Consulting Contract is void or voidable by NDPS and that it is unenforceable by DAI because it is unconscionable as to



NDPS, it is not supported by adequate consideration or the consideration is illusory, it was induced by fraud, and is ambiguous. NDPS further seeks a declaration that NDPS owes DAI no sum of money under the contract.

26.     NDPS additionally seeks a declaration that the arbitration clause within the Consulting Contract is void or voidable by NDPS and that it is unenforceable by DAI because it is unconscionable as to NDPS.

## B.     BREACH OF CONTRACT

27.     DAI promised that it would perform a detailed analysis of NDPS's practice to determine the nature of its business, its yellow page advertising needs, etc., and would use this information to make a recommendation to NDPS as to the advertising strategy that would (1) save NDPS money and (2) be as or more effective than what NDPS had been doing on its own.

28.     DAI failed to perform this analysis. Instead, DAI recommended a strategy that NDPS could have figured out on its own -- discontinue nearly all advertising. This was not based on any analysis of NDPS's business needs as promised in the Consulting Contract. DAI did not provide other options, strategies, or information as promised in the Consulting Contract.

29.     DAI breached the Consulting Contract by its failure to perform the promised detailed analysis of NDPS's business and by failing to provide the information identified in the Consulting Contract as part of its "Strategic Process."

30.     NDPS has been damaged by DAI's breach in the amount of money it paid DAI under the contract.

31.     NDPS is additionally entitled to recover its reasonable attorney's fees incurred in defending DAI's claims pursuant to Tex. Civ. Prac. & Rem. Code Ch. 38.



32.   All conditions precedent to the recovery of NDPS's attorney's fees have been performed.

### C.   VIOLATION OF DTPA

33.   DAI violated the Texas Deceptive Trade Practices Act ("DTPA"), Tex. Bus. & Com. Code § 17.50, by inducing NDPS to enter into a contract that is unconscionable.   DAI additionally violated the DTPA by committing deceptive trade practices including, but not limited to, Tex. Bus. & Com. Code § 17.46(b)(3), (5), (7), (9), and (24).

34.   DAI's actions are the producing cause of damages to NDPS including, but not limited to, the amount of money it paid DAI under the contract.

35.   NDPS is additionally entitled to recover its attorney's fees incurred in disputing and defending against DAI's claims pursuant to Tex. Bus. & Com. Code § 17.50.

### II.   APPLICATION FOR INJUNCTIVE RELIEF

### REQUEST FOR TEMPORARY RESTRAINING ORDER

36.   On or about November 14, 2007, DAI filed a Demand for Arbitration with the American Dispute Resolution Center ("ADR Center") in New Britain, Connecticut seeking to recover fees it alleges NDPS and Dr. Pollock individually owes it under the contract.   In this arbitration proceeding, DAI seeks to recover $123,444.31 from NDPS and Dr. Pollock.   A true and correct copy of the Claimant's Demand for Arbitration is attached to this petition as Exhibit C.

37.   NDPS contends that the arbitration provision in the Consulting Contract is unenforceable because it is unconscionable.   Specifically, the arbitration clause in the contract provides (1) the arbitration may be one-day only, (2) the arbitration service must render an award within 60 days of the date the arbitration claim is

filed, (3) within 2 weeks of an arbitration demand being filed, NDPS is required to provide DAI with its "complete file" and failure to do so will result in DAI's damage calculation being taken without objection, (4) if the arbitrator finds there is a contract, he/she is required to award DAI all its attorney's fees and all interest from the date the contract was signed, and may not award punitive damages, may not render any "middle ground" or "compromise awards" and must hold the parties to the terms of the contract. NDPS claims that these terms are so one-sided in favor of DAI as to be unconscionable. Further, the fact that these terms take away remedies and defenses that would be available to NDPS under law renders the provision unconscionable as well. *See Ingle v. Circuit City Stores, Inc.,* 328 F.3d 1165, 1178-79 (9th Cir. 2003), *cert. denied,* 540 U.S. 1160 (2004).

38.    NDPS additionally contends that the ADR Center is not a neutral arbitration service because DAI uses it for virtually all of its arbitrations (which, based on representations made by DAI's president, are numerous). In fact, DAI arbitrates so often that it offered to provide for NDPS a list of arbitrators that it has used before and that it has found to be "good."

39.    Under federal law (in the event the Federal Arbitration Act applies here), Connecticut law and Texas law, the question of whether the arbitration clause in the Consulting Contract is enforceable is a "gateway" question for the court to decide. *Howsam v. Dean Witter Reynolds,* 537 U.S. 79, 83 (U.S. 2002) (question of whether the parties have submitted a particular dispute to arbitration is an issue for judicial determination); *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 227 (Tex. 2003) (trial court must determine whether a valid agreement to arbitrate

exists); *Martin Nussbaum v. Kimberly Timbers, Ltd.,* 856 A.2d 364, 369 (Conn.. Sup. 2004) (only court can decide threshold issue of existence of agreement to arbitrate).

40.   Moreover, Tex. Civ. Prac. & Rem. Code § 171.023 provides that a court shall stay an arbitration that has been filed if the court finds that there is no valid agreement to arbitrate. Likewise, under Connecticut law, if a party challenges the validity or enforceability of an arbitration agreement, it may refuse to arbitrate and compel judicial determination of the issue of arbitrability. *MBNA America Bank v. Felton,* 2004 Conn. Super. LEXIS 3263 (Conn. Super. 2004).

41.   A Connecticut court is not the proper forum to resolve this dispute. Connecticut courts have no jurisdiction over NDPS or Dr. Pollock. The Consulting Contract was signed in Dallas County, Texas, DAI's representative came to Dallas when it gave its proposal to NDPS, and the advertisement placed on behalf of NDPS by DAI was placed in a Dallas publication.

42.   On November 26, 2007, the undersigned counsel received a letter from the ADR Center dated November 15, 2007, enclosing a list of potential arbitrators and stating that NDPS must return its arbitrator selections and file an answer and counterclaim within seven days from the date of the letter. Because the seven days had already expired by the time counsel for NDPS received the letter, the ADR Center granted NDPS a seven-day extension of these deadlines. Thus, NDPS's deadline to respond and return its arbitrator selections is now Monday, December 3, 2007. A true and correct copy of this correspondence from the ADR

Center, and a letter granting the extension until December 3, 2007, are both attached to this petition as <u>Exhibit D</u>.

43.  Plaintiff asks the Court to issue a temporary restraining order restraining DAI from proceeding with the arbitration and enjoining the enforcement of any provisions in the arbitration provision of the Consulting Contract, including but not limited to the production of documents, setting of a hearing, or any other matter related to the arbitration proceeding until the issue of arbitrability can be determined by this court.

44.  It is probable that NDPS will obtain a judgment in its favor against DAI after a trial on the merits of the enforceability of the arbitration provision in the Consulting Contract, because the provisions in the arbitration provision are so one-sided as to be unconscionable as a matter of law.  Moreover, it is undeniable that NDPS will not be able to obtain a fair and impartial arbitration in the forum selected by DAI.

45.  It is also probable that NDPS will obtain a judgment in its favor against DAI after a trial on the merits as the Consulting Contract is clearly unconscionable, induced by fraud, unsupported by adequate consideration, was breached by DAI, and is ambiguous.

46.  If Plaintiff's application is not granted, harm is imminent, because NDPS will be forced to answer and proceed in the ADR Center arbitration proceeding, will incur significant expenses in so doing, and will be forced to proceed in a forum that it contends is improper and biased.

47. Plaintiff's application should be granted without notice to DAI because DAI is a Connecticut company, and its president, David Ford, who signed the arbitration claim is a Connecticut resident. It will be impossible to serve DAI and hold a hearing on the issue of the enforceability of the arbitration clause prior to the time NDPS is forced to take some action in the arbitration proceeding (i.e., answer, select arbitrators, produce documents).

48. The harm which will result if the temporary restraining order is not issued is irreparable because, as a matter of law, NDPS is entitled to a judicial determination of the enforceability of the arbitration agreement before the arbitration may proceed. *See Howsam*, 537 U.S. at 83; *J.M. Davidson, Inc*, 128 S.W.3d at 227; *Martin Nussbaum.*, 856 A.2d at 369. In this situation, the arbitration proceeding that the ADR Center is proceeding under, and that DAI contends is appropriate, is expedited such that it may well be concluded before the issue of arbitrability can be decided by this or any court. Additionally, the arbitration agreement requires the immediate production of documents that may be objectionable. If the arbitration is not stayed until the issue of arbitrability can be determined, NDPS will be forced to produce possibly objectionable documents in order to avoid the harsh and unconscionable terms of the arbitration clause. Moreover, if the arbitration proceeding is not stayed pending a decision on arbitrability of the dispute, NDPS and Dr. Pollock will be forced to retain local Connecticut counsel and spend thousands, if not tens of thousands of dollars, defending the arbitration claims. Finally, Dr. Pollock and NDPS will be irreparably prejudiced if they are required to proceed in a forum that is biased and



is not impartial with no rules of evidence or procedure that will protect their procedural and substantive rights. Once documents and evidence are produced and heard, they cannot be taken back.

49. NDPS has no adequate remedy at law for the harm that it will suffer if the ADR Center arbitration proceeding is not stayed until the issue of arbitrability is determined for the reasons stated above. The ADR Center will proceed with the arbitration under its expedited rules until it is ordered to stay or dismiss the proceeding by a court. By the time a court can determine the issue of arbitrability, NDPS and Dr. Pollock will have been forced to disclose information and documents that would otherwise be protected by privilege, or will have been preventing from asserting legal defenses and remedies. Conversely, DAI will suffer no detriment if the arbitration is stayed pending a determination of the validity of the arbitration clause. This will not affect DAI's day-to-day business, and if DAI is entitled to recover on its claims, any legal interest on DAI's damages will continue to accrue.

50. Plaintiffs are willing to post bond.

## REQUEST FOR TEMPORARY INJUNCTION

51. Plaintiffs ask the Court to set their application for temporary injunction for a hearing and, after the hearing, issue a temporary injunction against Defendant.

52. Plaintiffs have joined all indispensable parties under Texas Rule of Civil Procedure 39.

## REQUEST FOR PERMANENT INJUNCTION

53.   Plaintiffs ask the Court to set their request for a permanent injunction for a full trial on the merits and, after the trial, issue a permanent injunction against Defendant.

## PRAYER

WHEREFORE, for the reasons stated above, Plaintiffs asks that the Court issue citation for Defendant to appear and answer, and that Plaintiffs be awarded a judgment against Defendant for:

a.   Actual damages,

b.   Declaratory judgment,

c.   Temporary restraining order,

d.   Temporary injunction,

e.   Permanent injunction,

f.   Applicable prejudgment and postjudgment interest,

g.   Court costs,

h.   Attorneys' fees, and

i.   All other relief to which Plaintiff is entitled.

Respectfully submitted,

COOPER & SCULLY, P.C.

By

R. BRENT COOPER
State Bar No. 04783250
LAUREN N. PIERCE
State Bar No. 00784675

900 Jackson, Suite 100
Dallas, Texas 75202
(214) 712-9500
(214) 712-9540 (fax)

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF NOTICE AND THAT CASE NOT SUBJECT TO TRANSFER**

I hereby certify the Defendant was provided notice via fax and email of this application for injunctive relief by sending Defendant a copy of this petition and the proposed order granting the requested temporary restraining order on November 29, 2007, at _10:15_ o'clock a.m. I further certify that to the best of my knowledge this case is not subject to transfer under Dallas County Local Rule 1.06.

LAUREN N. PIERCE

## VERIFICATION

STATE OF TEXAS                      §
                                    §
COUNTY OF DALLAS                    §

    **BEFORE ME**, this day appeared Harlan Pollock, M.D., who, being duly deposed upon his oath, stated as follows:

    My name is Harlan Pollock.  I am the President of North Dallas Plastic Surgery and Associates ("NDPS"), and am authorized to make this affidavit on its behalf.  I am over the age of eighteen (18) and fully competent to give this affidavit.  The allegations made in the foregoing Petition and Application for Injunctive Relief are within my personal knowledge, and they are true and correct.

By: _____
           Dr. Harlan Pollock

    **SUBSCRIBED AND SWORN TO** before me this _29_ day of ___Nov___, 2007.

_Stacy Michelle Everett_
Notary Public, State of Texas

My Commission Expires: _aug 6, 2011_



STACY MICHELLE EVERETT
My Commission Expires
August 6, 2011



EXHIBIT – A



## CONSULTING CONTRACT

Directory Assistants, Inc.

*page 1 of 3*

500 Winding Brook Drive • Glastonbury, CT  06033
Tel  860-633-0122 • Fax  860-633-2900

### THE GOAL OF THIS CONTRACT:

To help the advertiser make informed yellow and white page ("yellow page") buying decisions by utilizing Directory Assistants, Inc.'s ("DAI") Strategic Process.

### DAI'S STRATEGIC PROCESS:

*Step One:* DAI will help the advertiser identify its own specific business factors and understand how those factors relate to the purchase of yellow page advertising before a yellow page purchase is made.

*Step Two:* DAI will educate the advertiser on various yellow page options and strategies by disclosing information, cost saving suggestions, theories, options and advice the advertiser should consider when purchasing yellow page advertising. Information disclosed may include advice on directories, sizes, strategies, copy, concepts, colors, market plans, discounts, rates, removal of placements, etc. DAI makes no assumptions as to the advertiser's yellow page knowledge or experience and will cover all yellow page options and strategies available including basic directory yellow page fundamentals, some of which may seem "common sense" after the rationale is explained.

Combining the information reviewed in Step One and Step Two, the advertiser is in a position to make the yellow page purchase it believes best matches its own business needs.

*Step Three:* DAI offers its ad design services and assistance with implementing any yellow page decisions at no additional cost.

*Step Four:* DAI reviews and verifies all yellow page placements after publication at no additional cost.

*Step Five:* DAI reviews and verifies yellow page charges at no additional cost.

As needed, DAI may also assist and advise on additional ads or enhancements to existing ads at no additional cost. Any additional ads or enhancements to any existing ads will not be used to offset DAI's fee. The advertiser understands that yellow page results/effectiveness are not guaranteed. The parties agree to hold all information pertaining to the other confidential and agree not to disclose it to any third party.

### TERMINATION CLAUSE:

If DAI is unable to disclose information that would result in a gross savings of 40% or greater, the advertiser shall have the right to terminate this contract, provided DAI is unable to cure its default within ten days of receiving written notice.

### FEE FOR SERVICE OPTIONS:

The advertiser will choose one of the fee options outlined below at the time of entering into this contract. This will be the fee arrangement for the full term of this contract, unless the contract is terminated pursuant to the terms of the Termination Clause outlined above (See page three showing illustrations of all fee for service options.).

#### *Contingency Fee Options:*

The advertiser agrees to pay DAI a fee equaling either:

    a) 75% of any yearly yellow page savings for two (2) years;
    b) 50% of any yearly yellow page savings for three (3) years;
    c) 37.5% of any yearly yellow page savings for four (4) years.

Savings are defined as each separate year's renewal cost of the advertiser's baseline yellow page program less that particular year's revised cost (not including any additional ads or enhancements to any existing ads). A year is defined as the complete publication cycle for each next available directory in an advertiser's baseline yellow page program.

The parties understand that DAI's Strategic Process is educational in nature and that once the Strategic Process begins there is no way to determine the origin of any future cost saving change(s). Therefore, the parties agree that DAI will be compensated for any and all cost saving change(s) not identified on this contract as pre-disposed change(s) for the term of this contract.

WHITE: DAI     CANARY: FILE     PINK: CUSTOMER

Consulting Contract 12-4-03

Feb. 21. 2007  3:28PM    North Dallas Plastic Surgery                          No. 7596   P. 3

Aug. 4. 2004  1:42PM    NDPSA                                                No. 0225   P. 3

# CONSULTING CONTRACT                                          page 2 of 3

Baseline yellow page program is defined as the advertiser's yellow page program in effect as of the date of this agreement, per directory publisher's contracts. If a directory is renamed or rescoped, the closest directory(s) having the largest distribution will be used to determine the baseline for that directory.

The fee for service in year one is due when DAI receives written authorization from the advertiser or when any change is made with a directory publisher. The fees in subsequent years shall be due on the respective anniversary dates of this contract.

Under the contingency fee option, the advertiser is under no obligation to make any changes, even after hearing DAI's information. If no changes are made from the baseline then no fee will be due.

## One Time Set Fee Option:

The advertiser agrees to pay DAI a one time set fee equaling 65% of the renewal cost of its baseline yellow page program. Baseline yellow page program is defined as the advertiser's yellow page program in effect as of the date of this agreement, per directory publisher's contracts. If a directory is renamed or rescoped, the closest directory(s) having the largest distribution will be used to determine the baseline for that directory.

Under the set fee option, the fee for service is due within two weeks of the signing of this contract.

The advertiser is under no obligation to use or act upon the information disclosed by DAI in any way, even after hearing DAI's information. However, under the Set Fee Option the parties agree the fee is due regardless of whether or not the advertiser implements any cost saving change(s) and whether or not the information is used or acted upon.

## TERMS:

Late payments will be subject to a monthly fee of 1.5% and the advertiser will be responsible for all costs of collection including all legal fees ($250 per hour) and all arbitration costs. In the event DAI must seek to enforce or convert an arbitration award, or defend any judicial action, the parties agree the advertiser will also be responsible for all additional attorney's fees ($250 per hour) and costs incurred beyond any arbitration proceeding. This contract represents a complete understanding of the parties, supercedes any verbal or other understandings and will be binding on any successors and/or assigns, branches, affiliates or subsidiaries of the advertiser. Both parties acknowledge that they have read this contract and have had the opportunity to review it with counsel of their choice before signing it.

## RESOLUTION OF DISPUTES:

If the contingency option is chosen, the parties understand fees due cannot be fully calculated until the last book in an advertiser's baseline yellow page program publishes for the final time during the term of the contract. Therefore, in the event of an advertiser breach the parties agree to accelerate fees due to a liquidated damages amount equal to 40% of the year one renewal cost of the baseline program multiplied by the length of the contract (two, three or four years) plus tax, late fees and legal costs. In the event of an advertiser breach, the total fee will be considered to have been due on the date of this contract.

If the set fee option is chosen, the parties agree the advertiser will pay the set fee plus tax, late fees and legal costs.

The parties agree to resolve any dispute through confidential binding arbitration. The arbitration will consist of a one day hearing only (without motions or briefs) administered by an alternative dispute resolution service ("ADR") under its most expedited commercial arbitration rules in Hartford, CT under CT law. The ADR service will render an award within sixty days of either party filing a demand for arbitration. Within two weeks of a demand being filed, DAI agrees to provide the advertiser with its complete file and the advertiser agrees to provide DAI with all its advertising contracts and confirming orders for the past three years. Failure to do so will result in DAI's damage calculation being taken without objection. The parties agree that if the arbitrator finds there is a contract, he/she is required to award DAI all its attorney's fees and all interest from the date this contract is signed. The parties also agree the arbitrator will have no authority to award punitive damages, will not render any "middle ground" or "compromise awards" and must hold the parties to the terms of the contract. A judgment may be obtained and entered upon the award in any court in either Connecticut or the home state of the advertiser, at the option of the prevailing party, and both parties hereby expressly consent to and waive any objection to the jurisdiction of the court selected by the prevailing party for purposes of seeking a judgement on the arbitration award.

WHITE: DAI    CANARY: FILE    PINK: CUSTOMER

Consulting Contract 12-4-03

Feb. 21. 2007 3:28PM    th Dallas Plastic Surgery          No. 7596  P. 4
: Aug. 4. 2004 1:42PM    NDPSA                             No.0226  P. 4

# CONSULTING CONTRACT

*page 3 of 3*

## Sample Illustrations of Savings and Fee Structures

These sample illustrations are intended to show how the various fee options are calculated over the term of the contract. These examples assume a baseline spending of $100,000, which may be higher or lower than the advertiser's, with a publisher rate increase of 2%, which can vary year to year. Finally, these assume the advertiser elects to reduce its costs by 40% in year one, and maintains its year one decisions.

*Contingency Option A* - 75% of any yearly savings, based on changes made for two (2) years:

| 75% 2 YEARS | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | TOTAL |
|---|---|---|---|---|---|---|
| Baseline Costs | $100,000 | $102,000 | $104,040 | $106,121 | $108,243 | $520,404 |
| Revised Costs | $60,000 | $61,200 | $62,424 | $63,672 | $64,945 | $312,241 |
| Gross Savings to Advertiser | $40,000 | $40,800 | $41,616 | $42,449 | $43,298 | $208,163 |
| DAI Fee | $30,000 | $30,600 | $0 | $0 | $0 | $60,600 |
| Net Savings to Advertiser | $10,000 | $10,200 | $41,616 | $42,449 | $43,298 | $147,563 |

*Contingency Option B* - 50% of any yearly savings, based on changes made for three (3) years:

| 50% 3 YEARS | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | TOTAL |
|---|---|---|---|---|---|---|
| Baseline Costs | $100,000 | $102,000 | $104,040 | $106,121 | $108,243 | $520,404 |
| Revised Costs | $60,000 | $61,200 | $62,424 | $63,672 | $64,945 | $312,241 |
| Gross Savings to Advertiser | $40,000 | $40,800 | $41,616 | $42,449 | $43,298 | $208,163 |
| DAI Fee | $20,000 | $20,400 | $20,808 | $0 | $0 | $61,208 |
| Net Savings to Advertiser | $20,000 | $20,400 | $20,808 | $42,449 | $43,298 | $146,955 |

*Contingency Option C* - 37.5% of any yearly savings, based on changes made for four (4) years

| 37.5% 4 YEARS | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | TOTAL |
|---|---|---|---|---|---|---|
| Baseline Costs | $100,000 | $102,000 | $104,040 | $106,121 | $108,243 | $520,404 |
| Revised Costs | $60,000 | $61,200 | $62,424 | $63,672 | $64,945 | $312,241 |
| Gross Savings to Advertiser | $40,000 | $40,800 | $41,616 | $42,449 | $43,298 | $208,163 |
| DAI Fee | $15,000 | $15,300 | $15,606 | $15,918 | $0 | $61,824 |
| Net Savings to Advertiser | $25,000 | $25,500 | $26,010 | $26,531 | $43,298 | $146,339 |

*Set Fee Option* - 65% of the baseline renewal cost for one (1) year

| SET FEE | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | TOTAL |
|---|---|---|---|---|---|---|
| Baseline Costs | $100,000 | $102,000 | $104,040 | $106,121 | $108,243 | $520,404 |
| Revised Costs | $60,000 | $61,200 | $62,424 | $63,672 | $64,945 | $312,241 |
| Gross Savings to Advertiser | $40,000 | $40,800 | $41,616 | $42,449 | $43,298 | $208,163 |
| DAI Fee | $65,000 | $0 | $0 | $0 | $0 | $65,000 |
| Net Savings to Advertiser | ($25,000) | $40,800 | $41,616 | $42,449 | $43,298 | $143,163 |

## ADVERTISER ACCEPTANCE:

The advertiser has chosen the:  one-time set fee option  or  contingency option:  two year  three year  four year
Circle and initial

## PREDISPOSED CHANGES:  (Leave Blank if None)

_____     North Dallas Plastic Surg.  8/3/04
Party Authorized to Contract for Advertiser          Advertiser DBA              Date

_____                                8/4/04
Directory Assistants, Inc.                                       Date

WHITE: DAI    CANARY: FILE    PINK: CUSTOMER          Consulting Contract 12-4-03

Received Time Feb.21. 3:25PM

**EXHIBIT – B**

Westlaw.

Not Reported in A.2d                                                    Page 1
Not Reported in A.2d, 2003 WL 1874737 (Conn.Super.)
(Cite as: Not Reported in A.2d)

YellowPageConsultants, Inc. v. Kate's Paperie
Conn.Super.,2003.
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.
Superior Court of Connecticut,Judicial District of
Hartford.
YELLOWPAGECONSULTANTS, INC.
v.
KATE's PAPERIE.
No. CV020821496S.

March 14, 2003.

Rittenband, JTR.
**1** YellowPageConsultants, Inc. (hereinafter also
"YPC") is a corporation the purpose of which is to
give advice to clients to reduce their costs of
telephone directory advertising. On February 19,
1999, YPC and the defendant Kate's Paperie
(hereinafter also "KP"), a specialty paper company
operating three stores in New York, New York,
entered into a Consulting Agreement which is
attached as Exhibit A hereto which agreement
provided, *inter alia,* that YPC would analyze the
directory advertising program of KP and disclose
information on how the advertiser may reduce its
directory advertising expense in return for which KP
agreed to pay YPC fifty percent of any yearly
directory advertising savings which would result
from the acceptance of information by the advertiser
over a three year period. Defendant made no changes
in its directory advertising in the first year and was
not, therefore, billed for same. Defendant then made
changes for year two and for year three. Plaintiff
claims that in the second year defendant reduced its
directory advertising expenses in the amount of
$13,464, and YPC billed the defendant for $6,732. In
the third year, defendant reduced its directory
advertising expense in the amount of $24,345. The
total savings amounted to $37,809, and the plaintiff
billed the defendant in the amount of one-half thereof
or $18,904.50 which the defendant has not paid.

In the second year of the contract KP informed YPC
that it was making changes in its directory
advertising program but declined to advise YPC of
the changes or to meet with a representative of YPC.
Hans Parrado, KP's Manager of Operations, advised
the plaintiff that the publisher of the Yellow Pages

had suggested changes, modifications and discounts
to convince defendant to continue its business with
them. Mr. Parrado also testified that on the basis of
customer surveys as to how customers heard about its
stores, defendant decided to curtail its directory
advertising and shift to advertising in the New York
Times, various New York magazines and on the
Internet.

Because of this dispute between the parties YPC
initiated arbitration as provided in the Consulting
Agreement. The American Arbitration Association
appointed James Curtin as arbitrator on July 18,
2002. On November 13, 2002 the arbitrator made a
written award, a copy of which award is attached as
Exhibit B. The arbitrator's decision stated, *inter
alia:*"On the basis of the record in this case I do not
find that the Claimant (YPC) provided information to
the Respondent (KP) that resulted in savings to the
Respondent ... The more persuasive evidence in this
case was that the changes in the Respondent's
directory advertising program were completely
unrelated to the information it received from the
Claimant ... The claim of YellowPageConsultants,
Inc. is denied."

STANDARD OF REVIEW

The determination of the issues before this Court has
to be based upon the evidence submitted to it with the
briefs of the parties. Further, it is plaintiff's burden to
produce sufficient evidence to invalidate the award.
Awards based upon consensual arbitration are subject
to only minimal judicial intervention. See
*Metropolitan District Commission v. AFSCME,* 37
Conn.App. 1 (1995). Every reasonable presumption
and intendment must be indulged in favor of the
award. *Cashman v. Sullivan & Donega, P.C.,* 23
Conn.App. 24 (1990). Unless the submission
provides otherwise, an Arbitrator has authority to
decide factual and legal questions, and courts will not
review the evidence, or where the submission is
unrestricted, the Arbitrator's determination of legal
questions. *O & G/O'Connell Joint Venture v. Chase
Family Limited Partnership,* 203 Conn. 133
(1987)."When the scope of the submission award is
unrestricted, the resulting award is not subject to de
novo review for errors of law so long as the award
conforms to the submission."*SCRRA v. American Re-
Fuel Co. of Southeastern Connecticut,* 44 Conn.Sup.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1874737 (Conn.Super.)
(Cite as: Not Reported in A.2d)

482, 484, 485 (1997), aff'd., 44 Conn.App. 728 (1997)."The authority of an arbitrator to adjudicate the controversy is limited only if the agreement contains express language restricting the breadth of the issues, reserving explicit rights, or conditioning the award on court review."*Id. 485*."... Any challenge to an award pursuant to CGS § 52-418(2)(4) on the grounds that the arbitrators exceeded or imperfectly performed their powers is properly limited to a comparison of the award to the submission."*Board of Education v. Local 818, 5* Conn.App. 636, 639 (1985).

**\*2** The plaintiff has cited CGS § 52-418(a)(4) as a basis for the Court to vacate the Award. Said section reads as follows: "... or (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."Plaintiff further claims that "Validating this arbitration award would clearly violate the long-standing public policy of enforcing arm's length transactions between two commercial entities."

A leading case concerning the powers of the court to vacate an arbitration award is *Garrity v. McCaskey,* 223 Conn. 1 (1992). An arbitration award may be vacated on grounds of manifest disregard of the law under § 52-418(a)(4) only when it "manifests an egregious or patently irrational application of the law. [This] ground for vacating an arbitration award is narrow and should be reserved for circumstances of an arbitrator's lack of fidelity to established legal principles."*Id.* at 10.

"[Where] the submission does not otherwise state, the arbitrators are empowered to decide factual and legal questions and an award cannot be vacated on the grounds that the construction placed upon the facts *or the interpretation of the agreement by the arbitrators* was erroneous. Courts will not review the evidence *nor, where the submission is unrestricted, will they review the arbitrators' decision of the legal questions involved."*Trumbull v. Trumbull Police Local, 1745, 1* Conn.App. 207, 213 (1984) (emphasis added).

## ISSUES

1. Did the award violate public policy?

In its memorandum of law dated February 7, 2003 plaintiff cites two arguments for vacating the

Arbitration Award. The second argument is that "Validating this arbitration award would clearly violate the long standing public policy of enforcing arms length transactions between two commercial entities."The parties agreed at oral argument that the submission by the parties to the arbitrator was unrestricted. The Court concludes that the Award conforms to the Submission.

"Even in the case of an unrestricted submission, we have, however, recognized three grounds for vacating an award: (1) the award rules on the constitutionality of a statute; (citations omitted) (2) the award violated clear public policy; (citations omitted) or (3) the award contravenes one or more of the statutory proscriptions of CGS Sec. 52-418."*Garrity v. McCaskey,* 223 Conn. 1, 6 (1992). Clearly, the award did not rule on the constitutionality of a statute.

"The public policy exception applies only when the award is clearly illegal or clearly violative of a strong public policy ...*In light of the strong public policy that favors arbitration* and in deference to the existing statutory scheme through which the legislature has chosen to define this field, we decline the defendant's invitation to create a new exception independent of CGS Sec. 52-418."*Garrity v. McCaskey, supra,* page 7 (emphasis added).

**\*3** However, one public policy can be subordinate to another more important public policy. In *International Brotherhood of Police Officers v. Windsor,* 40 Conn.Sup. 145 (1984), Satter, J., the public policy that a police officer should not be insubordinate to orders of his commanding officer gave way to the important public policy that police officers tell the truth. In that case, the police officer had refused to sign a false arrest warrant return. A police officer telling the truth is an important public policy that supersedes the public policy that an officer carry out the orders of his commanding officer.

Of course, there is a public policy to enforce contracts legally made. However, such a policy could serve as a basis for any contract dispute, and it is up to the finder of fact to determine whether the contract has been violated. In the case at bar, the arbitrator found that the contract had not been violated. Moreover, it is clear to this Court that the general principle or policy of enforcing contracts is subordinate to the strong public policy favoring arbitration. Accordingly, this argument of plaintiff is rejected.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1874737 (Conn.Super.)
(Cite as: Not Reported in A.2d)

Page 3

2. Did the arbitrator exceed his powers or so imperfectly execute them that a mutual, final and definite award upon the subject matter submitted was not made?

This is the claim of the plaintiff under CGS Sec. 52-418(a)(4). The second argument of the plaintiff is as follows:
By correctly identifying all relevant issues of fact and law but by refusing to apply the plain language of the contract, the Arbitrator exceeded his power under the law to reach his decision;

"Because the arbitration clause was an unrestricted submission (as in the case at bar), we will not review the arbitrator's legal conclusions. 'Where the submission does not otherwise state, the arbitrators are empowered to decide factual *and legal questions* and an award cannot be vacated on the grounds that the construction placed upon the facts or the interpretation of the agreement by the arbitrators was erroneous. (Emphasis added.) Courts will not review the evidence nor, where the submission is unrestricted, will they review the arbitrators' decision of the legal questions involved.' " *Wachter v. UDV North America, Inc., 75 Conn.App. 538, 545 (March 2003).*

"[T]he law in this state takes a strongly affirmative view of consensual arbitration ... Arbitration is a favorite method to prevent litigation, promote tranquility and expedite the equitable settlement of disputes ... As a consequence of our approval of arbitral proceedings, our courts generally have deferred to the award that the arbitrator found to be appropriate ... The scope of review for arbitration awards is exceedingly narrow ...*Additionally, every reasonable inference is to be made in favor of the arbitral award and of the arbitrator's decisions.*(Emphasis added.) *Id.* 543.

As the Arbitrator stated in his decision in the case at bar: "Both the Claimant and the Respondent are in agreement that the key issue in this dispute involves the contractual language that 'any change to an advertiser's DA program which results in savings will be attributed to information received from YPC.' " Although the Arbitrator did not specify his reasons for finding that the defendant had not breached the contract, under the principle that every reasonable inference is to be made in favor of the arbitral award and of the arbitrator's decisions, the Court concludes that the arbitrator agreed with the defendant that such language was unconscionable and, therefore,

unenforceable. Further, there was a lack of consideration for this language.

**\*4** Additionally, this language conflicts with the language in the consulting agreement that says: "The Advertiser agrees to pay YPC 50% of any yearly DA savings which would result from *the acceptance of information by the advertiser* for (3) years."(Emphasis added.) It is well-settled law that if there is any ambiguity in a contract, the ambiguity is decided against the party who prepared the contract which, in this case, is the plaintiff. As the arbitrator found, there was no acceptance of information by the defendant that resulted in savings to the defendant. The arbitrator's language is: "I do not find that the Claimant provided information to the Respondent that resulted in savings to the Respondent ... The more persuasive evidence in this case was that the changes in the Respondent's directory advertising program were completely unrelated to the information it received from the claimant."

"Even if the arbitrators were to have misapplied the law governing statutes of limitations, such a misconstruction of the law would not demonstrate the arbitrators' egregious or patently irrational rejection of clearly controlling legal principles. The defendant's claim in this case falls far short of an appropriate invocation of CGS Sec. 52-418(a)(4) for a manifest disregard of the law ... the defendant has not demonstrated anything more than his disagreement with the arbitrators' interpretation and application of established legal principles ... Acceptance of his argument would turn every disagreement with arbitrators' rulings of law into an allegation of manifest disregard of the law. We have never construed CGS Sec. 52-418(a)(4) so broadly and we decline to do so today."*Garrity v. McCaskey, supra,* pages 11, 12, 13.

At the most, what the Arbitrator did was a simple legal error that is not reviewable by the court." *Wachter v. UDV North America, Inc., supra.*

Accordingly, in the case at bar, this argument of the plaintiff is rejected.

## CONCLUSION

For the foregoing reasons, the application of the plaintiff to vacate the award is denied and the application of the defendant to confirm the award is granted.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                    Page 4
Not Reported in A.2d, 2003 WL 1874737 (Conn.Super.)
(Cite as: Not Reported in A.2d)

EXHIBIT A

CONSULTING AGREEMENT

SERVICES PROVIDED:

**YellowPageConsultants, Inc. ("YPC")** agrees to review and analyze the advertiser's directory advertising ("DA") program and to disclose information on how the advertiser may reduce its DA expense.

Information disclosed may include advice on directories, sizes, strategies, copy, concepts, colors, market plans, discounts, etc.

YPC agrees to hold confidential all information pertaining to the advertiser's DA program and marketing plan. The advertiser agrees information conveyed by YPC is confidential and agrees not to disclose it to any third party.

YPC may also assist and advise on any additional ad(s) or enhancements to any existing ad(s). The cost for any additional ad(s) or enhancements to any existing ad(s) will not be used to offset any fee due to YPC.

FEE FOR SERVICE:

*5 The advertiser agrees to pay YPC 50% of any yearly DA savings which would result from the acceptance of information by the advertiser for three (3) years. A year is defined as the complete publication cycle for each directory in an advertiser's base DA program. Any credits received for past publisher errors or overbillings will be billed 50% of the total credit for one time only.

TERMS:

The fee for service for each of the three (3) years is due upon the acceptance of any information for that particular year.

Acceptance of information occurs when YPC receives written authorization from the advertiser or, if YPC receives no written authorization, when any change(s) is authorized with a directory publisher. Any change to an advertiser's DA program which

results in savings will be attributed to information received from YPC.

The savings each year will be defined as that year's *renewal rate* of the advertiser's base DA program less the *revised cost* which would result from any information accepted by the advertiser in that particular year. Base DA program is defined as the advertiser's DA program in effect as of the date of this agreement per directory publisher's contracts.

Late payments will be subject to a monthly fee of 1.5% and the advertiser will be responsible for all reasonable costs of collection including legal fees and/or arbitration costs.

This agreement will be binding on any successors and/or assigns, branches, affiliates or subsidiaries of the advertiser.

IN THE EVENT OP NONPAYMENT:

The parties understand fees due cannot be fully calculated until the last book in an advertiser's base DA program publishes for the third time. Therefore, in the event of nonpayment, YPC reserves the right to collect liquidated damages. Liquidated damages will be one and one half (1 1/2 ) times the gross savings which would result from the acceptance of information in the first year in which the acceptance of information occurs (in addition to the late fees and costs described above).

YPC reserves the right to require any dispute to be settled through binding arbitration administered by the American Arbitration Association, under its Commercial Arbitration Rules, which will render an award in accordance with Connecticut law in Hartford County. A judgment of any court having jurisdiction may be entered upon the award. The parties agree any judicial proceeding arising out of this agreement will be brought in Connecticut.

NO FEE PROVISION:

The advertiser is under no obligation to accept any information from YPC. If the advertiser does not accept any information, no fee is due.

EXHIBIT B

Re: 12 147 00627 02

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1874737 (Conn.Super.)
(Cite as: Not Reported in A.2d)

In the Manner of the Arbitration between

**YellowPageConsultants, Inc., Claimant and**

Kate's Paperie, Respondent

I, the Undersigned Arbitrator, having been designated in accordance with the arbitration agreement entered into between the above named parties and dated February 19, 1999, and having been duly sworn and having duly heard the proofs and allegations of the Parties, do hereby AWARD as follows:

*6 In its Demand For Arbitration, Claimant claims a breach of contract with a claim for relief in the amount of $23,519.07. Respondent did not file an answer. Under the Rule R-4(c) of the American Arbitration Association Commercial Dispute Rules it is deemed that Respondent denies the claim.

A hearing before the undersigned Arbitrator was held on Monday, September 23, 2002, at which the parties appeared with counsel and presented testimony and evidence. Post-hearing briefs were filed by both parties on October 14, 2002, and reply briefs were filed by both parties on October 21, 2002.

### Background of the Dispute

Claimant, YellowPageConsultants, Inc. is in the business of reviewing and analyzing a client's directory advertising program and advising clients on how to reduce directory advertising expenses. Respondent, Kate's Paperie, is a specialty paper company operating three stores in Manhattan, New York.

On February 15, 16 or 17, 1999, Claimant's representative, Jason Genga, met with Respondent's Director of Marketing, Ms. Ann Sgarlato. He reviewed with her the Claimant's Consulting Agreement and left a copy with her. Otto Zalivary, Respondent's Director of Purchasing, reviewed the Consulting Agreement with Ms. Sgarlato and signed on February 19, 1999. Ms. Sgarlato then sent a copy by facsimile to Mr. Genga who signed for the Claimant dated February 19, 1999.

On March 2, 1999, Mr. Genga met with Ms. Sgarlato and discussed Respondent's Directory Advertising and Analysis consisting of a section devoted to questions of a client regarding its current directory advertising program and a section devoted to a discussion of such items as directory sizes, strategies, copy, design, graphics, color, market plans and discounts.

In a follow-up call during March 1999, Ms. Sgarlato informed Mr. Gengas that Respondent was not going to make changes to its directory advertising program that year. Claimant did not bill Respondent for that year.

In April 2000, the second year of the contract, Ms. Sgarlato informed Mr. Genga that Respondent was making changes in its directory advertising program, but she declined to send copies of the planned changes to Mr. Genga or to meet with him. On May 9, 2000, Hans Parrado, Respondent's Manager of Operations, informed Mr. Genga that the publisher of the yellow pages had suggested changes, modifications and discounts to convince Respondent to continue its business with them. Mr. Parrado also testified that on the basis of customer surveys as to how customers heard about its stores, Respondent decided to curtail its directory advertising and shift to advertising in the *New York Times,* various New York magazines and on the Internet.

The changes made by the Respondent in its directory advertising program in the year 2000 reduced its directory advertising expenses in the amount of $13,464.00 and Claimant billed Respondent $6,732.00 which Respondent has not paid. In 2001, the third year of the contract, Respondent reduced its directory advertising expense in the amount of $24,345.00. Claimant billed Respondent $12,172.50 that Respondent has not paid.

### Relevant Contract Provisions

*7 The Consulting Agreement (Joint Exhibit 1) provides in pertinent part that:
Fee for Service-The advertiser agrees to pay YPC [YellowPageConsultants, Inc.] 50% of any yearly DA [Directory Advertising] savings which would result from the acceptance of information by the advertiser for three (3) years.
Terms-Acceptance of information occurs when YPC received written authorization from the advertiser or, If YPC receives no written authorization when any change is authorized with a directory publisher, any change to an advertiser's DA program which results in a savings will be attributed to information received from YPC.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1874737 (Conn.Super.)
(Cite as: Not Reported in A.2d)

### Position of the Parties

Claimant relies on the language of the duly executed Consulting Agreement to support its claim that Respondent owes the total of $30,701.84 in unpaid fees, interest, attorney fees, plus to-be-determined costs. It is Claimant's position that the plain language of the contract is unambiguous; that Claimant has performed its obligations under the contract; and that Respondent has saved over thirty thousand dollars on its directory costs since receiving Claimant's information. Further, Claimant emphasizes that the language in the parties' contract which states "Any change to an advertiser's DA program which results in savings will be attributed to information received from YPC" precludes any claim by Respondent that it had made changes for reasons not attributed to Claimant's services.

The Respondent challenges that the Claimant has not provided any written evidence showing the nature or content of recommendations that are specific to Respondent's business that resulted in savings to the Respondent. Further, that Respondent decided to reduce its directory advertising program after customer survey results and other information led it to conclude that its directory advertising program was not effective. In addition, Respondent argues that the language in the Consulting Agreement that Claimant relies upon is unconscionable and, therefore, unenforceable.

### Discussion

Both the Claimant and the Respondent are in agreement that the key issue in this dispute involves the contractual language that "Any change to an advertiser's AD program which results in savings will be attributed to information received from YPC."

As recited above, it is Claimant's position that it performed its obligations under the agreement and provided information that resulted in savings when the Respondent reduced its directory advertising program. In support of this position, Claimant offered the testimony of Jason Genga, its Account Manager, who testified that after Respondent signed the Consulting Agreement he met with Ms. Ann Sgarlato, Respondent's Director of Marketing, and reviewed Claimant's Directory Advertising Analysis form. Mr. Genga further testified that after a follow-up call in 1999 when Me. Sgarlato informed him no changes would be made the only other contact he had

with the Respondent was a call in 2000 when Ms. Sgarlato informed him that Respondent was making changes to its directory advertising program, but that she did not ask him for any recommendations; did not want to send him any copies of the changes and declined to meet with him.

*8 Further, on cross-examination, Mr. Genga testified that he made no other recommendations in writing about changes that would save the Respondent money and was not sure what helped the Respondent to save money.

On the basis of the record in this case I do not find that the Claimant provided information to the Respondent that resulted in savings to the Respondent.

The only evidence the Claimant provided to support its $30,701.84 claim is the one meeting that Mr. Genga had with Ms. Sgarlato during which Claimant's Directory Advertising and Analysis form was discussed. It is true that during discussion of the Directory Advertising and Analysis form such items as directory sizes, copy, color, market plans and discounts were discussed and these items are listed in the Consulting Agreement as information that may be disclosed to an advertiser. However, the Claimant failed to demonstrate that it provided information with regard to the Respondent's directory advertising that resulted in any savings to the Respondent.

The more persuasive evidence in this case was that the changes in the Respondent's directory advertising program were completely unrelated to the information it received from the Claimant.

### Arbitrator's Award

The claim of YellowPageConsultants, Inc. is denied.

"The administrative fees and expenses of the American Arbitration Association totaling $900.00 and the compensation of the arbitrator totaling $2250.00 shall be borne equally by the parties and have been paid."

This award is in full and final settlement of any and all claims submitted to this Arbitration.

Conn.Super.,2003.
Yellow Page Consultants, Inc. v. Kate's Paperie
Not Reported in A.2d, 2003 WL 1874737 (Conn.Super.)

Not Reported in A.2d
Not Reported in A.2d, 2003 WL 1874737 (Conn.Super.)
(Cite as: Not Reported in A.2d)

END OF DOCUMENT



© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.



**EXHIBIT – C**

**AMERICAN DISPUTE RESOLUTION CENTER**

---

DIRECTORY ASSISTANTS, INC.,
     Claimant,

v.

NORTH DALLAS PLASTIC SURGERY AND ASSOCIATES
Dr. Harland Pollock, DBA North Dallas Plastic Surg

     Respondents.

---

     **November 14, 2007**

## CLAIMANT'S DEMAND FOR ARBITRATION

### INTRODUCTION

This arbitration involves a straightforward claim for breach of contract. Directory Assistants, Inc. ("DAI") and North Dallas Plastic Surgery and Associates and Dr. Harland Pollock DBA North Dallas Plastic Surg (here after collectively referred to as "NDPS") entered into a written contract (See attached). DAI agreed to educate NDPS on ways it could reduce its yellow page expenses. In exchange, NDPS agreed to pay 50% of any savings for a period of three years.

The contract states how savings are calculated:

> "Savings are defined as each separate year's renewal cost of the advertiser's baseline yellow page program less that particular year's revised cost (not including any additional ads or enhancements to any existing ads). A year is defined as the complete publication cycle for each next available directory in an advertiser's baseline yellow page program."

Savings are recalculated in each of the three years of the contract. This allows a customer to avoid any economic liability in any or all of the three years. This is the case even after DAI

performs.  NDPS could have avoided paying any fee in any or all of the three years.  All NDPS had to do was renew their "baseline yellow page program" and there would be no savings and no fee for that year.  However, that never happened in this case.

## *FACTS OF THIS CASE*

The facts of this case are straightforward.  The Respondent contracted for a service.  The Respondent received the service.  The Respondent received the benefit of the bargain.  NDPS admits all of this.  The Respondent just no longer want to pay the agreed upon price.

In year one of the contract, NDPS stated DAI's product, service and information were "outstanding".  NDPS stated DAI performed to its "complete satisfaction".  NDPS made numerous cost saving changes.  NDPS paid DAI.[1]

In year two, however, this commercial entity, a Doctor no less, that took a calculated risk. NDPS took a risk that it could deceive DAI into believing no further fees were due under the contract. When that failed, NDPS unsuccessfully tried intimidating DAI into not enforcing its rights under the contract.

---

[1] DAI under billed NDPS in year one.

### *NDPS' DECEPTION*

In year two of the contract, DAI contacted NDPS.  By way of a letter, NDPS represented it had "reinstated our previous yellow page advertising program", thus no fee would be due in year two.

NDPS had every right to revert back to its baseline yellow page ads.  If NDPS had reverted back to its baseline ads, NDPS would have owed DAI no fee for year two or year three.

DAI sent two separate letters reminding NDPS of its contractual obligations.  NDPS was advised that if it went back to its baseline yellow page ads, it was correct that no fee would be due. NDPS was also advised that if it did make any cost saving changes, it would be billed per the terms of the contract.  NDPS was asked to contact DAI if it had any questions.  NDPS did not.

NDPS understood its right to return to its baseline ads.  However, NDPS did not realize DAI would check the subsequent publications and uncover the deception.

DAI checked the subsequent publications.  NDPS' representation that it had reverted back to its baseline yellow page ads was false.  After uncovering NYPS' deception, DAI billed NDPS. NDPS did not pay this or any other bill.

## *NDPS' THREATS*

NDPS attempted to avoid its contractual obligation by making various threats to DAI.

The first threat was NDPS "advising" DAI that the "esteemed" Dr. Pollock was very influential in the Dallas business community, and that DAI would be well advised not to enforce its contract. Apparently, NDPS felt it could continue to receive the benefit of the cost savings without paying the agreed upon fee. This threat did not deter DAI.

When the "esteemed" advisory failed, NDPS made another threat. This time, NDPS threatened it had "lost business" as a result of cost saving changes made in year one; that the contract was fraudulently induced; that no service were provided, etc. NDPS vowed to recover "damages."

DAI asked NDPS to substantiate its "lost business" claim. NDPS could not. We submit NDPS could not substantiated damages because there were none.

When these threats failed, NDPS told DAI that if DAI did not accept a monetary settlement offer, NDPS would complain to the BBB and the Texas AG.[2]  The settlement offer was substantial. It also showed that NDPS realized who the plaintiff in this case was.

---

[2] DAI advised NDPS they were free to make any complaint to any agency they felt appropriate. Indeed, DAI advised NDPS that even if a settlement were reached, it would not require NDPS to relinquish any right to complain to any agency.

However, the offer was not what the Respondent owed under the contract. And DAI could not accept any settlement based on threats or false claims of wrongdoing. Either way, it became abundantly clear that NYPS would say and do anything to prevent DAI from being paid its just compensation. Despite NYPS' threats, DAI has brought this action.

## *POINTS OF LAW*

The issues in dispute are largely factual. In addition, the legal issues are hardly arcane, especially to an Arbitrator with years of commercial experience. Accordingly, we simply outline the legal principles that may be applicable to the claims and defenses in this matter.

## DAI's Breach of Contract Claim

"The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *Rosato v. Mascardo*, 82 Conn. App. 396, 411, 844 A.2d 893 (2004).

## *Agreement*

There can be no good faith dispute as to the existence of a contract. Indeed, the contract is attached. The significance of NDPS' President signing the contract cannot be minimized. The signatory is officer of the corporation *and* a Doctor.